UNITED STATES v. MINNESOTA MIN-ING & MANUFACTURING CO. et al.

Civ. A. No. 8119.

United States District Court
D. Massachusetts.

Sept. 13, 1950.

As Amended Sept. 20, 1950.

---

George W. Wise and Harold D. Cohen, Washington, D. C. (Oliver H. Bassuener, Washington, D. C., Herbert A. Bergson, Asst. Atty. Gen., Gerald J. McCarthy, and Marcus A. Hollabaugh, Sp. Assts. to Atty. Gen., on the brief), for plaintiff.

Charles M. Price, Chicago, Ill. (Mac-Leish, Spray, Price & Underwood, Chicago, Ill., Choate, Hall & Stewart, Boston, Mass., John L. Connolly, St. Paul, Minn., Robert C. Keck, Chicago, Ill., and Stuart C. Rand, Boston, Mass., on the brief), for Minnesota Mining & Manufacturing Co.

George Link, Jr., New York City (Mc-Kercher & Link, New York City, Hale & Dorr and Joseph N. Welch, all of Boston, Mass., on the brief), for Behr-Manning Corporation, Durex Abrasives Corporation and Durex Corporation.

William S. Gaud, Jr., New York City (Carter, Ledyard & Milburn, New York City, Ropes, Gray, Best, Coolidge & Rugg, Boston, Mass., H. Struve Hensel, Edgar C. Morrison, New York City and Francis H. Burr, Boston, Mass., on the brief), for Carborundum Co.

George E. Leonard, Jr., Chicago, Ill. (Ely, Bartlett, Thompson & Brown and Charles W. Bartlett, all of Boston, Mass., on the brief), for Armour & Co.

WYZANSKI, District Judge.

## Findings of Fact

### A. Introduction

1. Count 2 of the complaint is before the Court for adjudication. It charges defendants with violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2, with respect to foreign trade and commerce in coated abrasives. On May 2, 1950 the Court severed this count for separate trial. On that count it received evidence tendered by the parties. These findings, conclusions and decree represent a final determination and judgment of this Court upon that count. In accordance with Fed.Rules Civ.Proc. rule 54, 28 U.S.C.A., this Court hereby determines that there is no just reason for delay and that the ac-

tion on Count 2 shall be terminated forthwith in this Court.

2. There are six defendants. The first four are domestic manufacturers of coated abrasives: Minnesota Mining and Manufacturing Company, Behr-Manning Corporation, The Carborundum Company and Armour and Company. The fifth is Durex Abrasives Corporation—hereafter called the Export Company. It was organized May 23, 1929 under the Webb-Pomerene Act, Act of April 10, 1918, c. 50, 40 Stat. 516, 15 U.S.C.A. §§ 61–65, by the first four defendants and five other former domestic manufacturers of coated abrasives, American Glue Company, Baeder Adamson Company, Wausau Abrasives Company, H. H. Barton & Son Company and United States Sandpaper Company. The sixth is The Durex Corporation—hereafter called Durex. It also was organized by the same companies on May 23, 1929 and, as will appear later, is a corporation holding securities of foreign companies and holding foreign patents.

3. Prior to May 1929 the aforesaid nine domestic manufacturers of coated abrasives were engaged individually in the export of coated abrasives from the United States to many foreign countries, including the British Commonwealth of Nations, Germany and France. Their total sales in 1928 exceeded $3,295,000. The rate of export was increasing in 1929 and amounted to over 86% of the total dollar value of all United States exports of coated abrasives. Several of these domestic manufacturers had foreign patents and were engaged in research with the object of securing other patents. There is no satisfactory evidence that in 1929 either the export or the related patent business was conducted at either an out-of-pocket loss or at what proper accounting would show to be a loss.

4. In May 1929 the nine domestic manufacturers adopted a three-pronged program, each prong of which will be considered separately—first, the Export Company and the related Export Agreement (fdgs. 5–17); second, Durex and its manufacturing subsidiaries (fdgs. 18–22) and third, the main patent agreement and related license agreements (fdgs. 23–30).

Thereafter these findings will recite in detail (fdgs. 31–43) and in more summary form (fdgs. 43–45) the business relationships and relative exports of the Export Company and of the Durex subsidiaries.

### B. Creation of the Export Company

5. The nine domestic producers formed the Export Company on May 23, 1929 under the laws of Delaware "to engage solely in export trade, as the term * * * is defined in the * * * Webb-Pomerene Act." The nine subscribed to the stock in the approximate proportion that those companies had exported coated abrasives in 1927 and the first ten months of 1928. However, the stock is now owned by the four manufacturing defendants and the others have dropped out of the picture. The Export Company has filed with the Federal Trade Commission all information and annual reports required by the Webb-Pomerene Act.

6. On the same day the Export Company was formed, the nine companies entered into an Export Agreement. Each company agreed to export only through the Export Company, with certain exceptions. This provision was canceled in October 1948. However, the member companies have not solicited any foreign business since 1948 but have continued to refer inquiries to the Export Company. And Minnesota, which is the only member that has actually made shipments, has dealt only with the foreign plants of American manufacturers and in each case has accounted to the Export Company (in accordance with a provision of the Export Agreement of May 23, 1929) for the profit.

7. The territory of the Export Company initially included all the countries of the world except the United States and its territories and possessions and Canada, but by amendment on May 20, 1931 Canada was added to the export territory. The Export Company was to purchase its requirements of coated abrasives from the shareholders in proportion to their holdings of stock in the Company. A party to the Agreement desiring to withdraw prior to December 31, 1954 might do so on one

year's notice upon agreeing to refrain from competing with the Export Company until after December 31, 1956. After December 31, 1954 a party might withdraw by giving two years' notice. On June 1, 1944 the Export Agreement was amended to extend these dates to December 31, 1964 and December 31, 1966 respectively.

8. Upon beginning business in 1929, the Export Company established its principal office in this country. It established a European sales manager with offices in Europe to direct the sales in Continental Europe and a sales manager in this country to handle export sales to other countries. It adopted the policy of using the trade name DUREX and subsidiary brand names to avoid promoting products under the hundreds of trade names used by the member companies.

9. The Export Company has purchased all its coated abrasive products on direct order from its member companies. It has paid, in accordance with the Export Agreement, the "net variable cost" plus a pro rata share of the average fixed burden. "Net variable cost" was defined to include cash out-of-pocket disbursements and to exclude charges of a fixed nature which would have been incurred even if such abrasive products had not been manufactured. If the net variable costs of the different members varied, the differences were adjusted by using a weighted average of the costs of all members.

10. The Export Company has had three methods of distribution.

11. One was through distributors in foreign countries with whom it made contracts. Three different forms of distributor contracts were used prior to February 1947. Two of these three forms required the distributor to carry stocks and solicit trade; the third did not. One of these forms made the distributor exclusive in his area; another provided for a fixed number of other distributors in his area; a third was non-exclusive. All distributor contracts made since February 1947 require the distributor to carry stocks and solicit trade but provide that the arrangement is not exclusive.

12. A second method was for the Export Company to sell coated abrasives to domestic exporters for export to foreign countries. These sales to American exporters have been in the neighborhood of only $150,000 to $200,000 annually. There is no evidence that the Export Company has rejected any firm order placed by any American exporter for coated abrasives for export. To be sure, once in 1941 when Messrs. J. Jacobi and Company inquired about abrasives for Rangoon, the Export Company referred it to Durex Abrasives, Ltd., Birmingham. And again in January 1948 when Henri H. Kaufman, Inc. inquired with regard to a prospective sale in Canada, the Export Company told the exporter that abrasives of that particular type could be purchased in Canada from Canadian Durex Abrasives, Ltd. These were isolated cases not reflecting a policy of the Export Company to decline to meet the needs of competing American exporters.

13. The third method the Export Company has used to sell coated abrasives has been through foreign subsidiaries which operate warehouses stocking American coated abrasives available for immediate delivery to distributors and others. In 1929 it formed a wholly owned company, Abrasifs Durex, S. A., which stocked American abrasives, converted them into various sizes and shapes and sold them in France, French Morocco, Tunis and occasionally miscellaneous European countries. In 1930 the Export Company formed a wholly owned company, Durex Schleifmittel, G. m. b. H., which until 1935 sold American abrasives in Germany and occasionally other European countries. In 1947 the Export Company formed a wholly owned company named Durex de Mexico, S. A., which maintains a tape warehouse and promotes the sale of tape products in Mexico.

14. In seeking export business, the Export Company has always been in competition with many foreign manufacturers who have ties of nationality, local preference and sometimes of governmental subsidies or low labor costs.

15. The Export Company has also been in competition with American producers who are not members of the Export Company. Their export volume and their share of the market have risen steadily, increasing from 17.7% of the total American exports of abrasives in 1929 to 39.7% in 1948. This growth has occurred despite the Export Company's policy followed until 1947 of discouraging foreign distributors from handling competing products of American origin and its policy of occasionally cutting prices to meet American competition abroad. Despite these occasional cuts in price the regular practice of the Export Company has been to sell coated abrasives at prices substantially higher than those of its American competitors. There is no reason to believe that any American producer had any difficulty in obtaining foreign distributors for coated abrasives. From the record of increased sales of American competitors and from the interest of American exporters in securing defendants' products in the United States for export abroad it is transparent that at least in some foreign areas and at some times when some types of American abrasives could have been sold at some profit defendants preferred to sell abrasives made in Durex's foreign subsidiaries.

16. The record of the Export Company's business reflects the principal events affecting foreign trade throughout the world. After World War I many countries, and principally members of the British Commonwealth of Nations, aided their own producers by campaigns to buy local products, by preferential tariffs, by import restrictions, by changes in and control of foreign exchange and other devices. During World War II the restrictions on the movement of goods and of money imposed by both this and other countries decreased the foreign export business of the Export Company except with Central and South American countries. After the cessation of hostilities American local demand took precedence over export. More recently the export business has been affected by lack of American dollars in foreign countries as well as by changes in official rates of foreign exchange.

17. In meeting competition in foreign markets, the Export Company's representatives have constantly sought favorable modifications of import restrictions, dollar shortages, discriminatory tariffs and the like. The Company has sought to sell abrasives made in the United States when they could be sold as profitably as abrasives made in its foreign subsidiaries. With this object in mind, the Export Company has consistently instructed its representatives to steer to it business which could be as profitably handled by the Export Company as by a Durex subsidiary.

## C. Creation of Durex and Its Subsidiaries

18. As already stated above on May 23, 1929 the same nine domestic producers of coated abrasives that formed the Export Company also formed Durex. Both the Export Company and Durex have had the same representatives of their member companies serving on their boards of directors and have had the same persons as executive officers, but not the same employees or sales forces. The assets and records of the two companies have not been commingled. The charter of Durex prohibits it from owning securities of any company engaged in importing into the United States.

19. In 1929 Durex formed and acquired 84% of the stock of Durex Abrasives, Ltd., which operates a coated abrasives plant in Great Britain. In 1930 Durex formed and acquired all the stock of Canadian Durex Abrasives, Ltd., which operates a coated abrasive plant in Canada. In 1935 Durex acquired a plant in Germany.

20. The formation of Durex and its English and Canadian subsidiaries was motivated by the recrudescence of economic nationalism after World War I. American manufacturers found that the establishment of foreign branch factories was a convenient way to hurdle wartime economic restrictions, to save transportation expenses and import duties, to overcome prejudice respecting imported goods, to take advantage of local sentiment and regula-

tions furthering local enterprise and to comply with local patent laws.

21. The German subsidiary reflects the impact of the even more aggressive type of economic nationalism characteristic of Hitler's Germany. It will be recalled that one of the channels of distribution used by the Export Company between 1930 and 1935 was Durex Schleifmittel, G. m. b. H. But after the Nazis came to power German regulations interfered with or prohibited Schleifmittel from paying the Export Company in American currency. Indeed in 1934 when the Export Company had credits of over $200,000 for coated abrasives shipped to Germany, it could not obtain payment in funds transmissible to the United States. After Export had accumulated a large non-transferable credit balance, it sold to Durex, at merely the original investment price, its shares of Schleifmittel. Simultaneously Export transferred to Schleifmittel its German good will and its German trade-marks on condition that goods manufactured thereunder should be sold and used only in Germany.

22. Durex now has completed plans for only one other foreign coated abrasives plant—one in Australia to be operated by a subsidiary it organized in 1945, Durex Abrasives Pty., Ltd. Durex also has under consideration plans for converting machinery in existing tape plants in South America and for a tape plant in South Africa.

### D. Patent Agreements

23. On May 23, 1929 the nine member companies entered into what is here called "the main patent agreement." The general scheme was for each member company to license Durex under all its *foreign* patents relating to coated abrasives but to reserve rights to fix prices and standards of manufacture for patented products. The particular method can be illustrated with reference to waterproof sandpaper. Minnesota agreed to license Durex under its *foreign* patents relating to waterproof sandpaper; the other members agreed to assign to Minnesota *foreign* patents covering waterproof sandpaper inventions; Durex was

to have a license under the assigned patents; and if the assignor withdrew from the main patent agreement it was to have non-exclusive licenses under the patents. With respect to foreign patents relating to discs, Carborundum had the same position as Minnesota had with respect to foreign patents relating to waterproof sandpaper.

24. A member's participation in the main patent agreement could be terminated only by a two years' notice served after December 31, 1954 or by dissolution, bankruptcy or certain defaults of a member. If a membership in the agreement terminated, the withdrawing member was obliged until December 31, 1950 to grant licenses on new patents; and the termination had no effect on outstanding licenses of old patents.

25. Concurrently with the execution of the main patent agreement each member gave the promised license to Durex. Thus, for example, Minnesota gave Durex and its subsidiaries a license covering waterproof sandpaper patents in foreign countries. With the exception of sales to the Export Company and certain other exceptions not now material, this was an exclusive license not only for foreign manufacture but also for export sale from the United States. On its part, Durex agreed not to import into the United States any product in which the patented inventions were used and to pay royalties and to abide by specified customary obligations of a license, as well as the prices and standards stipulated by Minnesota.

26. Concurrently Carborundum and Durex entered into a substantially similar license agreement for foreign patents relating to coated abrasive surfacing discs. On January 3, 1933 Behr-Manning and Durex and Armour and Durex entered into substantially similar license agreements relating to foreign patents covering respectively electrocoated sandpaper and heat-treated garnet abrasives.

27. After securing these licenses, Durex granted sublicenses with similar reservations to its subsidiaries each of which was given a license which was virtually exclusive except that it was limited to manufacture and sale in that subsidiary's coun-

try. Durex granted similar sublicenses to Abrasifs Durex, S. A., France, to Vagnone & Boeri, Italy and to Willy de Roy of Belgium. The royalties which Durex received from its licenses for the years 1930–1939 aggregated over $1,260,000.

28. In 1941 the Minnesota-Durex, Carborundum-Durex, Behr-Manning-Durex and Armour-Durex license agreements were each terminated and the main patent agreement was modified in these among other respects. Instead of licensing Durex on a royalty basis, the member companies agreed to make available to Durex, in so far as it was within their power to do so, exclusive rights under all foreign patents; Durex at the same time agreed to reimburse the members for royalties they paid third parties and to assume the members' costs of obtaining and maintaining foreign patents under which Durex accepted rights. The members lost their reserved rights to fix prices and standards. Durex did not lose, but did fail thereafter to exercise, its similar reserved rights over its sublicensees. Durex agreed to assign on demand to Minnesota, Carborundum and Behr-Manning, respectively, any United States patents acquired by Durex in the waterproof, disc and electrocoated fields; and to all the members on a non-exclusive basis any other United States patents acquired by Durex. On termination of the agreement, contributing members were to be reinvested with any patents which they had assigned to Durex. Any foreign patents which Durex might have acquired from other sources in the waterproof, disc and electrocoated fields were to go to Minnesota, Carborundum and Behr-Manning, respectively, who were required to grant the other members non-exclusive licenses thereunder. All Durex's other foreign patents were to become the joint property of the member companies. The term of the main patent agreement was extended to December 31, 1964 and for a period of not less than two years thereafter.

29. In fact, Durex did not acquire foreign patents from any company that is not a defendant in this case.

30. Durex and its subsidiaries have worked the patents of its members to the extent that the members have thought it worth while. Durex has not been requested to grant and has not granted licenses to others than its subsidiaries and the French, Italian and Belgian companies already mentioned.

E. Relations between the Export
Company and Durex Subsidiaries

31. Neither Durex nor any of its subsidiaries has made any agreement with the Export Company or any domestic or foreign manufacturer covering imports into the United States or commerce within the United States.

32. In some situations where economic and political situations curtailed the Export Company's opportunity to export profitably it arranged for a Durex subsidiary to supply the particular export.

33. Beginning in 1930 the Export Company arranged with Durex's British subsidiary to supply British Crown Colonies, British India, Egypt, Palestine, Iraq, Iran, Arabia and British Oceania possessions. These Durex sales totaled in the 1930's less than $25,000 a year; but in 1948 they approached $190,000. The Export Company has not, however, abandoned attempts to sell in those areas.

34. Certain South American railroads with British affiliations bought from 1934 through 1948 somewhat over $19,000 worth of abrasives from Durex's British subsidiary. But in the same period of time the Export Company's sales to South American countries exceeded $5,400,000.

35. In 1932 the Export Company arranged with Durex's British subsidiary to supply Durex coated abrasives in Australia and New Zealand (hereafter called the South Pacific), the arrangement being subject to cancellation on sixty days' notice and providing for the payment of a commission rising from 10% to 20%. These arrangements were made after a sharp fall of the Export Company's shipments to the South Pacific in the depression years 1930, 1931 and 1932, after discriminatory or preferential changes in the Australian and New Zealand tariffs and after the sharp fall in the value of the pound. Several times after 1933 the Export Company considered

abrogating the arrangements but the tariff and foreign exchange situation made it more economical to supply the market through Durex's British subsidiary. In 1939 Durex notified South Pacific distributors that the arrangement with the Export Company was terminated. However, the outbreak of World War II with its embargoes, currency difficulties and the like frustrated that announced termination. In 1946 when abrasives were in short supply in Britain and the United States and when South Pacific sought to deal with countries in the sterling bloc, the Export Company agreed with Durex's Canadian subsidiary that the latter should supply Australia on a commission basis and subject to a thirty-day cancellation provision.

36. The sales by Durex's British subsidiary to Australia and New Zealand from 1933 through 1946 were generally well over $150,000 a year, and indeed in 1941 over $400,000. The Canadian subsidiary's sales in this area exceeded $750,000 in 1948. Meanwhile the Export Company made virtually no sales in this market; its Australian volume dropped from over $191,000 in 1929 to less than $3,100 in 1948. [G. 75] During this same period from 1930 to 1948 the total sales in Australia of all American companies not defendants in this case were often under $500 a year and never reached $12,000 in any year. The sales in New Zealand were only slightly better.

37. Between June 1931 and March 24, 1937 the Export Company arranged with Durex's British subsidiary to supply emergency and shoe specialty requirements of Export's European distributors. The reasons for this arrangement were the time for transportation from America, or the preference of the customer for British goods, or difficulties in securing dollar exchange, or import restrictions. While the exact dollar value of these sales is not known, they never amounted to more than $41,000 a year and were less than $150,000 during the six-year period.

38. From March 24, 1937 through 1940 the Export Company acted under a formal "general agency agreement" whereby the British subsidiary of Durex supplied coated abrasives to such of Export's European distributors as Export designated at a commission of 10% payable to Export. The reasons were difficulties of dollar exchange, import restrictions, customer preference and sometimes mere convenience. The sales thus handled in each of the four years 1937–1940 were respectively under $27,000, $19,000, $27,000 and $20,000. In the same years the Export Company's sales to the same countries were over $502,000, $435,000, $590,000 and $153,000 and elsewhere in Europe were over $395,000, $384,000, $311,000 and $45,000.

39. During the war years 1941–1945 no sales were made under the general agency agreement. In December 1946 Export suspended the obligation to pay commissions. This waiver was to some extent due to Export's difficulties in shipping due to strikes and shortages, to Export's desire to cut prices to its customers, and to customers' difficulties in securing American dollars and licenses to import American goods. There is no showing as to what proportion of Export's European business was thus turned over to Durex's British subsidiary (and in the case of Dutch business, to Durex's Canadian subsidiary).

40. In 1937 the Export Company agreed with Durex's German subsidiary to have the latter sell certain of its products in Hungary, Poland, Roumania, Bulgaria, Denmark and Italy for a commission of 10% (after 1939, 5%) payable to the Export Company in Reichsmarks or blocked account currency. The reason for this arrangement was that these countries lacked dollar funds, had import restrictions and often were under German influence. After Germany invaded Czechoslovakia and the U. S. S. R. took over the Baltic states those countries were supplied by Durex's German subsidiary. The German subsidiary's sales to all European countries were less than $26,000 in 1937, $40,000 in 1938 and $70,000 in 1939.

41. From 1939 until 1948 Durex had no control over Durex Schleifmittel G. m. b. H. In the latter half of 1949 the Export Company made a new 10% commission agreement with the Durex German subsidiary covering Hungary, Czechoslovakia and Yugoslavia. These "iron curtain" countries

presented problems of currency and import restriction.

42. On June 6, 1946, the Export Company agreed with Durex's Canadian subsidiary that, at a 10% commission (reduced in 1948 to 7½%) payable to Export, the Canadian subsidiary should supply abrasives to designated Export distributors. So far Export has designated Australian distributors and two Dutch distributors. The Australian customers were included because the British subsidiary of Durex could not supply them; the Dutch were included because they were unable to obtain dollar exchange for all their requirements of coated abrasives from the United States.

F. Summary of Increase of Durex's Subsidiaries' Business Simultaneous with Decrease of Export Company's Exports to Certain Areas

43. The preceding findings 33–42 have stated in some detail the areas in which after 1929 the Export Company ceased to do business or did business on a restricted scale and in which Durex manufacturing subsidiaries supplied coated abrasives. Thus fdg. 33 referred to parts of the British Empire where Durex's British subsidiary did business from 1930 on; fdg. 34 to South American railroads from which Durex's British subsidiary secured insignificant orders after 1934; fdgs. 35 and 36 to the highly important markets of Australia and New Zealand which were supplied by Durex's British subsidiary from 1932 to 1946 and by Durex's Canadian subsidiary; fdg. 37 to the emergency and specialty requirements of European distributors filled from 1931 to 1937 by Durex's British subsidiary; fdgs. 38 and 39 to that portion of the European business which Durex's British subsidiary acting as Export's general agent received from 1937 to 1940 and since 1946; fdg. 42 to some Australian and Dutch orders executed by Durex's Canadian subsidiary. These findings must be read together with the records of the purely internal business done during the same period of time by these same British, Canadian and German Durex subsidiaries. As illustrative, it should be noted that taken together the external and internal sales of the Durex British subsidiary increased from under $1,680,000 in 1938 to over $5,488,000 in 1948 (while the Export Company's exports to Britain fell from over one million dollars in 1929 to less than nine thousand dollars in 1948 and while the Export Company was discontinuing all its own distributors in England). It is not shown at what rate of profit the British subsidiary did business in these years. In earlier years the business of the British subsidiary would appear to have been conducted at a very high rate of profit. The only years for which figures were given to the Court, 1936 and 1937, showed that on a business of $4,270,000 stockholders holding 84% of the stock received dividends of $1,540,076 or at a rate of over 42% of the gross sales [Ex. G37, p. 2]. The combined external and internal sales of the Durex Canadian subsidiary increased from under $518,000 in 1938 to over $2,035,000 in 1948 (while the Export Company's exports to Canada fell from over $423,000 in 1928 to less than $69,000 in 1948). With respect to the German situation it will be enough to observe that in 1948 Durex's German subsidiary sold half a million dollars' worth of coated abrasives while the Export Company sold none in the German or "iron curtain" areas.

44. However, if it be material at the same time that there was a decline in the exports of coated abrasives from the United States to the British Commonwealth of Nations there was an increase in the exports of raw materials and supplies. Whereas in 1929 there were exports of only $67,000 of raw materials to Durex's British subsidiary and none to Durex's Canadian subsidiary, by 1948 the respective figures were over $685,000 and $434,000.

45. In addition to the subsidiary facts already recited, the only others which seem important enough to warrant special findings are set forth in two tables which are conveniently printed as Appendices A and B of defendants' brief following page 118. The first table shows what the Export Company would charge its distributor (if it had any in England) for goods landed in Great Britain compared with what Durex's British subsidiary charges for the same goods. The second table is a correct summary of

exhibits G. 75a and c showing a comparison of exports to representative countries by the Export Company and by competing manufacturers. Without repeating verbatim these two tables here they are attached as appendices to the official Court copy of these findings filed with the Clerk; they are incorporated by reference; and they are used in connection with the conclusions of law set forth in the opinion.

## Opinion

Relying on §§ 1 and 2 of the Sherman Act, the Government in Count 2 complains of the combined action in the field of foreign commerce of the dominant American manufacturers of coated abrasives. Defendants answer that they took these joint steps to preserve and expand their foreign markets which were disappearing in the face of foreign countries' tariffs, quotas, import controls, dollar shortages, foreign exchange restrictions, local preference campaigns and like nationalistic measures. A central issue turns on defendants' joint establishment of manufacturing companies in England, Canada and Germany. A minor issue turns on their use of a Webb-Pomerene export association. The details of the case are set forth in the preceding 45 findings of fact and this opinion covers only questions of ultimate fact and conclusions of law.

The theme of defendants' argument is that the courses of conduct which they followed and which are described in the findings do not violate the Sherman Act because defendants did not and could not substantially affect, and had no motive or purpose to affect, American foreign commerce. They gladly concede that before May 1929 they exported from the United States substantial quantities of coated abrasives to many parts of the world including the United Kingdom, Canada, Australia, New Zealand, Germany and the countries now behind the "iron curtain"; that they do not do so in the same volume any longer; and that they supply substantial quantities of abrasives to those same areas from factories located abroad in which they are jointly beneficially interested. But they say, and their exhibits are offered to show, that the reason that they no longer make substantial exports from the United States to those areas is that they cannot do so profitably because of the economic and political barriers that others have erected. The diminution of their American exports to those areas, they allege, is not the consequence of their design or desire or conduct. The fault lies not in themselves but in their destiny determined by the machinations of foreign rulers and by the desires of foreign peoples.

With part of the defendants' argument there can be no legitimate quarrel. It is axiomatic that if over a sufficiently long period American enterprises, as a result of political or economic barriers, cannot export directly or indirectly from the United States to a particular foreign country at a profit, then any private action taken to secure or interfere solely with business in that area, whatever else it may do, does not restrain foreign commerce in that area in violation of the Sherman Act. For, the very hypothesis is that there is not and could not be any American foreign commerce in that area which could be restrained or monopolized.

Since there is no offense against the foreign commerce clause of the Sherman Act if political or economic conditions meet the conditions of the hypothesis just stated, it is legitimate for defendants to show such political and economic conditions, if they exist.

The relevant political and economic facts can be presented to the Court in an informal way. It is not necessary to comply with those minimal standards of evidentiary competence suitable for the proof of other types of fact even in the comparatively loose procedure commonly followed in a civil anti-trust case where the Government seeks an injunction. Cf. United States v. United Shoe Machinery Corp., D.C., 89 F.Supp. 349. It is sufficient if the economic and political facts come from published sources recognized as authoritative, persuasive or reliable by the profession of economists or political scientists, and if the publications are presented at a time and in a manner which give the adverse party adequate opportunity to examine, to challenge, to rebut and to argue upon them. In the case at bar these conditions were met. Defendants'

political and economic exhibits are of the type customarily cited in constitutional opinions of the Supreme Court of the United States, and defendants tendered them to the Government for examination before trial and introduced them in evidence in Court before the close of the testimony and argument of counsel.

But the nub of the case is not whether defendants' political and economic exhibits are admissible but whether they, taken together with the other evidence in the case, prove that defendants could not have profitably exported from the United States a substantial volume of coated abrasives to the areas supplied by their jointly owned factories located in England, Canada and Germany. To answer this factual question it is necessary to examine the situation in some of the principal areas so supplied.

The most significant area because of the large volume of actual and potential business is the United Kingdom. Defendants' contention is that after 1929 it was impractical to continue to export a large volume of coated abrasives from America to Britain because of Empire preference measures including official tariff restrictions and the more subtle aspects of a "Buy British" campaign. And these restraints became more effective when in the fall of 1931 the pound went off the gold standard.

█ It is not claimed that the United Kingdom imposed a legal ban upon imports of abrasives. Nor is it asserted that economically *no* American coated abrasives could be profitably exported to the British market. The precise contention is that it was economically *impractical* to continue to export to Britain a *large* volume of such abrasives. Stated another way this means, as we shall see, only that it was more profitable to make abrasives in Britain than to export them to Britain.

In support of their position defendants place great reliance on two points: first, that the prices at which they sold goods they made in England were much lower than the prices at which they sold goods they made in the United States and landed in England [See Table A referred to in fdg. 45]; and second, that in Australia

and New Zealand—countries which have been subjected to the same economic and political factors that affected the British market but where defendants had no joint manufacturing subsidiary—neither they nor their American competitors could sell a large volume of American-made abrasives.

A difficulty with the tabular comparison of defendants' prices for American-made and British-made abrasives is that it shows merely prices set by defendants. It does not show respective rates of profit. If there are large profits included in the prices set, then the table shows nothing more than that defendants could make large profits with American-made goods and even larger profits with British-made goods. And this possibility is by no means fanciful. The net profits in the prices set for defendants' British-made goods were at a higher than 42% rate in 1937 [fdg. 43]. Suppose the unrevealed net profits in the prices set for defendants' American-made goods were equally high. Then defendants would still have had a not unattractive rate of profit if they had reduced prices on their American-made goods to the level of their prices on British-made goods. And if it is further supposed that Durex's British subsidiary had not existed, presumably a respectable fraction of its business of millions of dollars a year would have gone to the Export Company selling the same goods at the same prices.

Defendants' reference to Australia and New Zealand is buttressed by statistics for the years 1929 through 1932 [See Appendix B to fdg. 45]. During those years Durex subsidiaries did not manufacture in or ship to that area. Yet the exports from the Export Company to Australia fell from $191,000 to $61,000, and to New Zealand from $43,000 to $3,000. The argument, while not without some merit, is not persuasive. The Australian figures do not withstand close analysis. For the annual movements for the four years 1929–1932 are (in thousands of dollars) 191, 98, 35 and 61. The decline and revival may not be unrelated to the world-wide depression. In any case, the decline in trade with Australia from 191 to 61 is at a

markedly lower rate than the decline in the same years of the Export Company's trade with Great Britain. There the fall was from $1,045,000 to $26,000 [Appendix B to fdg. 45]. One can hardly maintain therefore that the Australian experience proves that the decline in the Export Company's commerce with the United Kingdom was attributable not to defendants but to factors universal in the British Commonwealth of Nations such as tariffs, Empire preference measures, decline in the value of sterling, dollar shortages and customer preference for British Commonwealth goods.

Defendants make some other points worth answering.

They note that their American competitors did not succeed in selling a large volume of American goods either to those parts of the British Empire where Durex had factories or to other parts where Durex neither had factories nor shipped goods. And defendants say that this shows that after 1929 the Empire markets were closed to American goods. The reason that the argument is invalid in so far as it refers to areas where and times when Durex subsidiaries operated is that it does not prove that if that particular Durex competition had not existed the market could not have been reached by both the Export Company and its American competitors. The reason that the argument is invalid in so far as it refers to other areas is that it does not appear that American competitors' abrasives were ever as of good quality or as much in demand as defendants' abrasives, and it does not appear from Appendix B to fdg. 45 or elsewhere that the American competitors get much less business from the British Commonwealth now than they secured in a normal pre-depression year.

Next, defendants urge that they have always preferred to sell products made in their American factories. They have displayed their preference by vigorously combatting restrictions on imports and foreign exchange, by continuing to export several thousands of dollars annually to the United Kingdom and by making many arrangements with and licenses to their British fac-

tory temporary in character. Of course, no one doubts that if it were equally profitable to get British business for factories defendants owned in America and which received payment in dollars and for factories defendants owned in Britain and which received payment in pounds, defendants would elect the former. The fact that defendants used their British factories therefore justifies an inference that under the political and economic conditions in the United Kingdom defendants found it less profitable to sell from the United States factories than from the United Kingdom factories. It does not, and nothing else in the case can, justify a finding of fact that if defendants had not themselves established joint foreign factories it would have been legally or economically impossible to sell at some profit a substantial volume of defendants' American-made coated abrasives.

In short this Court finds as an ultimate fact that defendants' decline in exports to the United Kingdom is attributable less to import and currency restrictions of that nation and to the preferential treatment afforded to British goods by British customers than to defendants' desire to sell their British-made goods at a large profit rather than their American-made goods at a smaller profit and in a somewhat (but not drastically) reduced volume.

The Canadian situation does not differ from the British in substance. In 1928 the nine American manufacturers were exporting over four hundred thousand dollars' worth of coated abrasives to Canada. Canadian tariff changes and Empire preference schemes were threatening to cut into the profitableness if not the volume of this business. Clearly the economically advantageous course for defendants was to supply the Canadian market—and at later dates markets elsewhere in the British Commonwealth of Nations or in those countries in the British sterling bloc where there was a shortage of American dollars —from a Canadian rather than an American factory. And they did so. The Canadian factory's sales rose from half a million dollars in 1938 to over two millions dollars in 1948. In the latter year almost

40% of the total came from Australia and New Zealand—areas in which defendants' American competitors made negligible sales and in which the defendants were not making sales. Yet, for the reasons given when the British situation was discussed above, it does not follow, and it does not elsewhere in evidence appear, that if defendants had no joint ventures in foreign factories and no joint pledges covering their foreign business, they and perhaps their American competitors could not have exported a substantial amount of coated abrasives at a profit from the United States to Canada and to the Canadian factory's customers.

The only other market which deserves special notice in this opinion is Germany and its former satellites. In 1934 it became apparent that although abrasives could be exported from the United States to Germany the shippers could receive only blocked marks in payment. By September of that year defendants had credits of over $200,000 which, on account of exchange restrictions, could not be paid except in Reichsmarks. And the situation grew progressively worse in Germany and Eastern European countries as the Nazi power increased and spread in 1938–1939 to Austria, Czechoslovakia and Poland. Drastic as these measures were they did not absolutely prohibit the export of American abrasives at some profit to the German controlled area because triangular or barter trade was a possibility open to defendants. But it is not necessary to rest on that point. For after the cessation of hostilities five years ago the Nazi restrictions disappeared. There is no showing that now or at any time since 1945 it has been impossible for American abrasives to be exported to the German area at a profit.

■ There is not much left to this case once the Court has by its ultimate finding of fact rejected defendants' argument that not they but solely foreign principalities and powers make it impossible to export American abrasives in substantial volume and at a profit to large parts of the British Commonwealth of Nations and Germany.

■ Prima facie there could hardly be a more obvious violation of § 1 of the Sherman Act than for American manufacturers controlling four-fifths of the export trade of an industry to agree not to ship to particular areas but to do their business there through jointly owned foreign factories. It is, in statutory language, a "combination * * * or conspiracy, in restraint of trade or commerce * * * with foreign nations".

One aspect of this restraint has operated upon the commerce with foreign nations of the four manufacturing defendants and of the Export Company. The restraint has consisted in their united forbearance from supplying to certain areas American-made goods when other companies owned jointly by the manufacturing defendants could supply to those same areas equivalent foreign-made goods. To achieve the restraint they have not merely established jointly owned foreign factories. They have also by a concert of action conformed to arrangements not to export from the United States to those areas. These arrangements have included the temporary or permanent decisions of the Export Company not to ship to areas where Durex subsidiaries could ship or sell more profitably; the formal agreement from May 1929 through October 1948 of each of the American manufacturing defendants not to export except through the Export Company; and the practice of all of these manufacturing defendants since that date to refrain from making individual exports, with the minor exception of a few exports by Minnesota to foreign plants of American companies. Such a concert constituted a conspiracy within the intendment of § 1 of the Sherman Act. United States v. Paramount Pictures, 334 U.S. 131, 142, 68 S.Ct. 915, 92 L.Ed. 1260.

■ Another aspect of this restraint has operated upon the commerce with foreign nations of defendants' American competitors in the coated abrasives industry. The restraint has consisted in the effect of defendants' jointly owned foreign factories' precluding their American competitors from receiving business they might otherwise have received from the markets served by these jointly owned foreign factories. It may be that the American com-

petitors would not have received all or most of the business of these subsidiaries. The competitors might not have got the business because they may have made inferior products or may have been less aggressive merchants. The business, if it had not gone to Durex subsidiaries, might have gone in whole or in large part to the Export Company. But such speculation is unnecessary. When a dominant group of American manufacturers in a particular industry combine to establish manufacturing plants in a foreign area to which the evidence shows that it is legally, politically and economically possible for some American enterprises to export products in reasonable volume, then it is not necessary in an injunction suit brought by the Government to show that particular American competitive enterprises could have exported profitably to that area. The showing of the combination together with the showing of the possibility of profitable American exports in reasonable volume proves a violation of § 1 of the Sherman Act. Cf. United States v. United States Alkali Export Ass'n., D.C.S.D.N.Y., 86 F.Supp. 59, 70, 76. (Out of abundance of caution, it should be added that this does not mean that an American competitor could recover damages from one of the defendants in the absence of proof that that particular competitor was injured. Momand v. Universal Film Exchanges, 1 Cir., 172 F.2d 37.)

It is no excuse for the violations of the Sherman Act that supplying foreign customers from foreign factories is more profitable and in that sense is, as defendants argue, "in the interest of American enterprise." [Def.Rep.Br.31]. Financial advantage is a legitimate consideration for an individual non-monopolistic enterprise. It is irrelevant where the action is taken by a combination and the effect, while it may redound to the advantage of American finance, restricts American commerce. For Congress in the Sherman Act has condemned whatever unreasonably restrains American commerce regardless of how it fattens profits of certain stockholders.

Congress has preferred to protect American competitors, consumers and workmen.

Nor is it any excuse that the use of foreign factories has increased the movement of raw materials from American to foreign shores. We may disregard the point that the books are not in balance when raw materials actually transported are set off against finished products potentially transported. It is more significant that Congress has not said you may choke commerce here if you nourish it there.

Nor is it any excuse that as shown by the second table referred to in finding 45 in many markets, South American, for example, defendants have been expanding their export business and that in almost all markets defendants' American competitors have been getting a constantly larger share of the available business. What defendants are charged with is restraining not eliminating export trade. If defendants had never joined to operate factories abroad, both their and possibly their competitors' export trade would have been considerably greater.

Nor is it any excuse that American export trade might have been equally adversely affected if there had been—or if there should now be—established plants in Great Britain, Canada and Germany by one or more of the manufacturing defendants acting independently. Such supposititious individual action would, it is true, be a restraint upon American commerce with foreign nations. But such a restraint would not be the result of a combination or conspiracy. Hence it would not run afoul of § 1 of the Sherman Act. Nor would it, so far as now appears, have the purpose or effect of promoting one company's monopoly in violation of § 2 of the Sherman Act. Indeed the decree to be entered in this case will expressly contemplate allowing just such individual operation of foreign factories. For nothing in this opinion can properly be read as a prohibition against an American manufacturer seeking to make larger profits through the mere ownership and operation of a branch factory abroad which is not conducted as

part of a combination, conspiracy or monopoly.

 Exculpation is also sought under the terms of the Webb-Pomerene Act, Act of April 10, 1918, c. 50, 40 Stat. 516, 15 U.S.C.A. §§ 61–65. This is no cover for defendants' conduct. The statute is by its first section limited to that sort of "export trade" which consists of "commerce in goods * * * exported * * * from the United States * * * to any foreign nation". As the House Committee on the Judiciary stated, "The object of this bill is to aid and encourage our manufacturers and producers to extend our foreign trade." To use American capital, no matter how profitably, to extend the exclusively internal trade of a foreign country may contract but is unlikely to extend our foreign trade. Nothing in the statute, nor in its legislative history, nor in the penumbra of its policy justifies or has any bearing upon the right of defendants to join in establishing and financing factories in foreign lands. Export of capital is not export trade.

 Up to this point this opinion has considered whether it is a violation of that clause in section 1 of the Sherman Act dealing with "commerce with foreign nations" for the dominant manufacturers in an industry to combine to establish factories in certain foreign countries. And on that issue this Court has ruled as a matter of law that it was necessary to inquire whether, if the manufacturers had not combined, there could have been a substantial volume of profitable commerce moving to those foreign countries from American factories owned by these or other manufacturers; and the Court has found as a matter of fact that there could have been such a volume of commerce. But there is another facet of this case as a whole which should not escape mention and which the Government might test by presenting a purely formal, and therefore permissible, [See F.R.C. P. 15(b)] amendment to count 2 of its complaint. The Government might formalize a charge that this same conduct of defendants constitutes a violation of that clause in section 1 of the Sherman Act governing combinations in restraint of "commerce among the several States". It may very well be that even though there is an economic or political barrier which entirely precludes American exports to a foreign country a combination of dominant American manufacturers to establish joint factories for the sole purpose of serving the internal commerce of that country is a *per se* violation of this other clause of the Sherman Act. The intimate association of the principal American producers in day-to-day manufacturing operations, their exchange of patent licenses and industrial know-how, and their common experience in marketing and fixing prices may inevitably reduce their zeal for competition *inter sese* in the American market. And unlike a combination of producers to unite in exporting to foreign countries, a combination of producers to unite in manufacturing in foreign countries has not the benefit of the statutory immunity of the Webb-Pomerene or any other Act of Congress. It may, therefore, be subject to condemnation regardless of the reasonableness of the manufacturers' conduct in the foreign countries. In this aspect the reasonableness of the foreign conduct would, like the reasonableness of domestic price-fixing, be irrelevant. United States v. Trenton Potteries, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989. See United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, 427–428. Joint foreign factories like joint domestic price-fixing would be invalid *per se* because they eliminate or restrain competition in the American domestic market. That suppression of domestic competition is in each case the fundamental evil, and the good or evil nature of the immediate manifestations of the producers' joint action is a superficial consideration. Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 438, 60 S.Ct. 618, 84 L.Ed. 852; United States v. General Dyestuff Corp., D.C.S.D. N.Y., 57 F.Supp. 642, 647.

If this reasoning be correct, then the same logic would condemn defendants' conduct in using their factories in England, Canada and Germany to supply temporarily or permanently consumers in Australia, New Zealand, parts of the British Empire, European countries or other areas.

Even if these areas were economically or politically, permanently or temporarily closed to exports from America, defendants could not combine to supply them from foreign factories because their close alliance in these unexempted undertakings would inevitably bring them so close as unreasonably to restrain competition between themselves in the American home market. However, this point need not be decided at this juncture in this case if this Court is correct in its main rulings that because of their restraint on commerce with foreign nations it was unlawful to establish the joint factories and that the joint ownership must be terminated by decree in this case.

■ In view of the conclusion that defendants violated § 1 of the Sherman Act in their establishment of Durex and its manufacturing subsidiaries in England, Canada and Germany there is no occasion to consider any possible violation of § 2 of the Sherman Act by Durex or its subsidiaries. Nor is there need to devote much space to the problems raised by the main patent agreement creating for Durex a pool of the defendant manufacturers' foreign patents and by the subsequent subsidiary agreements. In their brief (p. 87) defendants admit that "This patent pool was created at the time Durex was formed to own and operate coated abrasive plants. * * * The patent agreement was an integral part of the plan of the nine domestic producers to build a British plant." Since the patent pool was avowedly ancillary to a plan which this Court finds to be a forbidden restraint of trade, the main and subsidiary patent agreements are invalid *in toto*. Hartford-Empire Co. v. United States, 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322; United States v. National Lead Co., 332 U.S. 319, 328, 67 S.Ct. 1634, 91 L.Ed. 2077; United States v. Line Material Co., 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701. It may be worth adding that the special provisions of the patent agreements relating to Durex's assignment of patents acquired by it will require no independent attention in this Court's decree. For in fact no such patents were ever acquired by Durex (Def.Br.90). And in theory no attempt is made to support the possible validity of these assignment provisions except as ancillary to the licenses, which are here condemned.

The Government contends that this Court should decree the termination of the American abrasives manufacturers' joint control not only of Durex and its foreign manufacturing and other subsidiaries but also of the Export Company organized under the Webb-Pomerene Act.

■ There is no doubt that in so far as the Export Company by transferring business to Durex's subsidiaries or authorizing them to act as its agent for the manufacture and sale of goods restrained the competition of American competitors its action fell under the same condemnation as the actions of Durex and its subsidiaries. Organization under the Webb-Pomerene Act does not give a corporation immunity from liability for its participation in other corporations' restraint of the export trade of their competitors. § 2 of the Webb-Pomerene Act, Act of April 10, 1918, c. 50, 40 Stat. 516, 517, 15 U.S.C.A. § 62. Cf. United States v. Borden Co., 308 U.S. 188, 204–205, 60 S.Ct. 182, 84 L. Ed. 181; Allen Bradley Co. v. Union, 325 U.S. 797, 809, 65 S.Ct. 1533, 89 L.Ed. 1939. But for such participation an adequate remedy against the Export Company is furnished by injunction. There is no more need to dissolve the Export Company than to dissolve Minnesota, Carborundum, Behr-Manning or Armour.

However, the Government's position is that wholly apart from the conspiracy with Durex and its subsidiaries, the manufacturing defendants and their Export Company by the terms of and their performance under their Export Agreement violated both § 1 and § 2 of the Sherman Act. It is the Government's view that it is unlawful for four-fifths of the American export trade to combine to export exclusively through one corporation, not available to others and from which they cannot withdraw at will, and for that corporation to fix the quotas within which and prices at which it will buy from its members and the prices at which foreign distributors sell its members' products, to require

its distributors to refrain from handling abrasives made by foreign (or before 1947 by foreign and domestic) distributors, and to charge higher prices to American exporters than to foreign distributors.

If the Government's contentions are sound, they must rest on the basis that these terms of the Export Agreement and the conduct which they expressly prescribe are what are now called *per se* violations of the Sherman Act. For there is no other evidence for finding as a fact that defendants designed or used the Agreement or the Export Company with the purpose or effect of monopolizing commerce in violation of § 2, or (except in its aspect as a support to the program of Durex and Durex subsidiaries) restraining commerce in violation of § 1.

■ Now it may very well be that every successful export company does inevitably affect adversely the foreign commerce of those not in the joint enterprise and does bring the members of the enterprise so closely together as to affect adversely the members' competition in domestic commerce. Thus every export company may be a restraint. But if there are only these inevitable consequences an export association is not an unlawful restraint. The Webb-Pomerene Act is an expression of Congressional will that such a restraint shall be permitted. And the courts are required to give as ungrudging support to the policy of the Webb-Pomerene as to the policy of the Sherman Act. Statutory eclecticism is not a proper judicial function.

Yet it is said that the arrangement at bar goes far beyond an ordinary Webb-Pomerene corporation. But surely the 1918 Congressional policy of promoting export corporations contemplated many of the features at which the 1950 Department of Justice looks askance. The recruitment of four-fifths of an industry into one export unit was foreseen by Congress, 53 Cong. Rec. 13538; 55 Cong.Rec. 3583–3584. The assignment of stock in an export association according to quotas, if not foreseen, has at least been silently acquiesced in. Federal Trade Commission Annual Report for 1939 at p. 149; TNEC Mono. No. 6, pp. 141, 288.

There may have been no similar Congressional prevision or approval of the firm commitments of members to use the unit as their exclusive foreign outlet, the refusal of the unit to handle the exports of American competitors, the determination of what quotas and at what prices each member should supply products to the unit, the fixing of re-sale prices at which the unit's foreign distributors should sell and the limitation of distributors to handling products of the members. Nonetheless, these are all such normal features of any joint enterprise and usually so essential to its stability and to preventing its members from taking individual selfish advantage of the knowledge and opportunities that have come to them as a group that, absent special circumstances revealing their unfairness or oppressive character in a particular setting, they are not outside the license granted by the Webb-Pomerene Act.

There are, however, four aspects of the Export Agreement and export practices of defendants which deserve some special comment.

■ The manufacturers' agreement to export only through the Export Company, while it would have been and will be lawful when standing in isolation, was unlawful when it was used in conjunction with the program whereby the Export Company chose not to export to areas where Durex and its subsidiaries could supply foreign-made abrasives at a greater profit. United States v. United States Alkali Export Ass'n., D.C.S.D.N.Y., 86 F.Supp. 59, 77; In the Matter of Pacific Forest Industries, 40 F.T.C. 843 (where though the face of the recommendations of the F. T. C. does not so disclose, the facts demonstrated that the members of the export association combined their agreement not to export individually with a further agreement not to sell to domestic exporting companies).

■ The manufacturers' agreement not to withdraw from the group or at least not to export independently at any time before 1966 was and is unlawful because the period is unreasonably long and cannot be supported as a device necessary to achieve stability. The provision must be replaced by a reasonable withdrawal allowance.

Taking into account the length of time the Export Company has already functioned and the changed situation which the decree in this case will effectuate, this Court determines that hereafter a reasonable provision would be one which allowed a member to withdraw within 2 years of the effective date of the decree of this Court or at any time thereafter upon giving 1 year's written notice.

■ There is room to question the Export Company's practice of establishing prices 10% to 30% higher for competitive American exporters than for the unit's own foreign distributors. Defendants urge that the price differential is explained by the requirement that foreign distributors should maintain a sales agency, keep defendants' goods in stock and promote their sale, whereas competitive American exporters perform none of these services and place sporadic casual orders when they have business. In so far as the facts support defendants' contention but no further defendants are entitled to discriminate. Otherwise their conduct would be a restraint upon competitive American exporters beyond the sanctions of the Webb-Pomerene Act. Accordingly this Court's decree will limit the discrimination to situations where the asserted differentials in service exist.

■ The final point relates to the Government's contention that defendants limit their distributors to handling defendants' (and, since 1947, other American) products. But this limitation is not designed to effect and has not effected a monopoly of channels of distribution. In fact the Export Company has fewer distributors now than the manufacturing defendants had when they exported separately and not through the Export Company. There is an ample number of foreign distributors available. And the actual volume of abrasives shipped by competing American exporters has been constantly increasing.

Purged of their connection with Durex, Durex subsidiaries and the whole Durex program and of the unreasonable provisions regarding withdrawal from the Export Agreement and regarding price discrimination, the Export Agreement and the Export Company will not be in violation of the Sherman Act. To invalidate the Agreement *in toto* and to dissolve the Export Company would be not to prevent a future, or dissipate the consequences of a past, violation of law but to punish an offender. It would in effect confiscate defendants' far-flung and legitimately acquired export business in Latin America and elsewhere. It would sacrifice the good will and other values built up in those areas for the trade name DUREX and for other marks and registrations. And it would destroy an organization which has in large measure realized the expectations which dictated the passage of the Webb-Pomerene Act.

Decree for plaintiff in accordance with this opinion.