### UNITED STATES v. MINNESOTA MINING & MANUFACTURING CO. et al.

### Civ. A. No. 8119.

United States District Court
D. Massachusetts.

March 12, 1951.

Gerald J. McCarthy, Sp. Asst. to the Atty. Gen., James M. Malloy, Roy N. Freed, Sp. Attys., Boston, Mass., Tom C. Clark, Atty. Gen., Herbert A. Bergson, Asst. Atty. Gen., Manuel M. Gorman, George W. Wise, Sp. Assts. to the Atty. Gen., H. G. Morison, Asst. Atty. Gen., Marcus A. Hollabaugh, Sp. Asst. to the Atty. Gen., Oliver H. Bassuener, Washington, D. C., for the United States.

John L. Connolly, St. Paul, Minn., Charles M. Price, Chicago, Ill., Charles W. Bartlett, Boston, Mass., George E. Leonard, Jr., Ray F. Feagans, Chicago, Ill., for Armour & Co.

Francis H. Burr, and Ropes, Grey, Best, Coolidge & Rugg, Boston, Mass., Edgar C. Morrison, and Carter, Ledyard & Milburn, New York City, James Carlisle, Washington, D. C., H. Struve Hensel, William S. Gaud, Jr., New York City, for Carborundum Co.

George Link, Jr., McKercher & Link, all of New York City, for Durex Abrasives and Durex Corp.

Stuart Rand, Boston, Mass., Charles M. Price, Robert C. Keck, Chicago, Ill., John L. Connolly, St. Paul, Minn., MacLeish, Spray, Price & Underwood, Chicago, Ill., for Minnesota Min. & Mfg. Co.

Richard B. O'Donnell, Hale & Dorr, J. N. Welch, all of Boston, Mass., for Durex Abrasives, Durex Corp., and Behr-Manning Co.

George Link, Jr., New York City, for Behr-Manning Co.

WYZANSKI, District Judge.

This case is before me upon a motion entitled "Revised Plan of Compliance with Decree filed March 6, 1951 by Defendant" as amended on pages 9 and 18 at today's hearing. In addition to the defendants' revised plan I have before me a memorandum filed by the Government today, "In Opposition to the Defendants' Revised Plan of Compliance with Decree".

At the hearing defendants' counsel started to explain the situation with respect to the German subsidiary, particularly in connection with taping and other machines. At the request of the Court defendants' counsel made an explicit state-

ment in regard to certain aspects of the Government's opposition to the plan in connection with the German subsidiary. After defendants' counsel had made that statement the Government withdrew that part of its objection which was directed to those aspects of the revised plan covering the German subsidiary. Hence, this Court need not consider that aspect of the Government's original objection any further.

The main point which has been considered at the bar today concerns the future of Durex. In Paragraph 8(a) of the decree entered by this Court on September 13, 1950, 92 F.Supp. 947, this Court ordered a dissolution of Durex. However, it is important to note that the decree was entered by this Court on the same day that the Court entered its findings of fact, conclusions of law and opinion. At the time of the entry of the decree the parties had not presented to the Court (and it might be said the parties had not been invited to present) such facts as bore upon the tax consequences of any remedies which might be involved in any final decree. The reality of the situation is, therefore, that the Court in entering its decree was not consciously mindful of any specific tax consequences of any provisions of its decree.

The first attention which the Court devoted to the tax aspects of its decree was on February 19th last. At that time incidentally in the course of the oral argument before this Court defendants' counsel referred to the tax consequences of a dissolution of Durex. The point was not elaborated and on February 20th, when this Court entered its memorandum rejecting in part the original plan for modification of the September 13, 1950 decree, this Court refrained from making any comments upon the tax consequences either of the Court's own decree of September 13, 1950 or of the defendants' first plan for modification of that decree.

It is true that the Court in its memorandum of February 20, 1951, did use general language stating that in the September 13, 1950 decree the Court had gone to the verge of the law to protect defendants' financial interests. However, that remark must be understood in its context. It was addressed to the problem of the future ownership of the manufacturing subsidiaries located in Canada, the United Kingdom and Germany.

The position of the defendants is that if their revised plan is approved by the Court, Durex will have no function except to own the stock of the British subsidiary, the Argentinian subsidiary and the Brazilian subsidiary, and to hold a certain amount of cash. The name of the corporation will be changed. It will not hold any patents. It will not issue any licenses or receive any licenses. Its charter will be so amended as specifically to preclude the corporation from engaging in the commercial activity of holding patents, issuing licenses, receiving licenses or the like. The only purpose for which Durex will be retained is to make it possible for Minnesota to use Durex as a convenient device for settling its financial obligations to the other defendants (obligations which will be consequent upon the decree of September 13, 1950) and to avoid placing Minnesota under the burden of paying an internal revenue tax which it would not have to do in the absence of a dissolution of Durex.

In general the object of the remedies under the anti-trust laws is to prevent the continuance of wrongful conduct, and to deprive the wrongdoers of the fruits of their unlawful conduct, and to prevent the creation anew of restraint forbidden by law. None of these objects requires that Durex should be dissolved so long as it is clear that Durex is limited to the purpose of holding for the benefit of Minnesota certain stock in subsidiaries located in the Argentine, Brazil and Great Britain.

If this Court were to require Minnesota and the other defendants to dissolve Durex, Minnesota would be quite free to proceed to create a new holding company and to have that holding company acquire the stock of the Argentinian, Brazilian and British subsidiaries. Thus it is transparent that the only effect of this Court insisting upon compliance with the exact wording of Section 8(a) of the decree of September 13, 1950 will be to force Minnesota to enter a situation where it must pay a tax. There is nothing in the revenue laws or their policy that would require Minnesota to become subject to that burden at once.

From the point of view of the fiscal policy of the United States the Congress has been content to allow taxpayers who have been accumulating capital gains to postpone pretty much to their own convenience the date when they realize those gains for tax purposes and make the appropriate accounting to the internal revenue officials. Acceleration of the capital gains tax does not serve any strictly revenue purpose.

However, the argument is advanced by the Government that the anti-trust laws do contemplate exactly such acceleration. It is the argument of the Government that when a violation of the anti-trust laws has occurred the Court is warranted, if indeed not compelled, to order a dissolution under certain circumstances, and such a dissolution effectuates the maturation of all tax liability.

The difficulty that I find in this argument is that there is no specific requirement of any anti-trust statute, or, indeed, of any case familiar to the Court, that dissolution and divestiture must always occur. The Court may withhold its hand in connection with dissolution in those cases where the anti-trust advantages are not sufficiently compelling to outweigh other disadvantages. Here there is no anti-trust advantage which follows from the dissolution of Durex for it has already been made plain that Minnesota is free to organize another corporation to perform exactly the same functions as would be performed by Durex. No one would argue that to run a company into a tax liability not thought necessary under the revenue laws serves an anti-trust purpose. The only time Congress has imposed any consequence as harsh as that,—to wit, the provision of the anti-trust laws in conection with the confiscation of goods shipped in interstate commerce in violation of the anti-trust laws,—the Courts have sedulously refrained from applying the legislative sanction.

Taking into account the whole situation, and particularly the fact that this Court did not at any earlier date advert specifically to the tax consequences of Section 8(a) of its decree of September 13, 1950, this Court now approves the plan filed March 6, 1951 as amended at today's hearing in connection with pages 9 and 18 thereof.