**PACIFIC SEAFARERS, INC., et al., Appellants,**

v.

**PACIFIC FAR EAST LINE, INC., et al., Appellees.**

**No. 21173.**

United States Court of Appeals District of Columbia Circuit.

Argued March 12, 1968.

Decided Sept. 30, 1968

Certiorari Denied Feb. 24, 1969.

See 89 S.Ct. 872.

Mr. Robert E. Sher, Washington, D. C., with whom Messrs. Abraham J. Harris, Marvin J. Coles and Neal M. Mayer, Washington, D. C., were on the brief, for appellants. Mr. Donald D. Webster, Washington, D. C., also entered an appearance for appellants.

Mr. Frederick M. Rowe, Washington, D. C., with whom Messrs. James M. Johnstone, Bertram Walker Rein, Washington, D. C., Edward D. Ransom, Gordon L. Poole, and R. Frederic Fisher, San Francisco, Cal., were on the brief, for appellees, Pacific Far East Line, Inc., et al.

Mr. Verne W. Vance, Jr., Boston, Mass., with whom Mr. Henry E. Foley,

Boston, Mass., was on the brief, for appellee Farrell Lines, Inc.

Messrs. James N. Jacobi and Richard W. Kurrus, Washington, D. C., entered appearances for appellee American Export Isbrandtsen Lines, Inc.

Mrs. Amy Scupi, Washington, D. C., entered an appearance for appellee American Union Transport, Inc.

Mr. Robert Burk, Washington, D. C., entered an appearance for appellee Matson Navigation Co.

Mr. J. Franklin Fort, Washington, D. C., entered an appearance for appellee Moore and McCormack Co., Inc.

Mr. Donald J. Mulvihill, Washington, D. C., entered an appearance for appellee Grace Line, Inc.

Mr. John K. Mallory, Jr., Washington, D. C., entered an appearance for appellee Waterman Steamship Corporation.

Mr. Elmer C. Maddy, New York City, entered an appearance for appellee Lykes Bros. Steamship Co., Inc., et al.

Before McGOWAN, TAMM and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

This case concerns the applicability of sections 1 and 2 of the Sherman Act to an alleged conspiracy among defendant-appellees, 21 American shipping lines and two conferences to which they belong,[1] to destroy plaintiff-appellants' business of carrying AID[2]-financed cement and fertilizer cargoes between Taiwan and South Vietnam. The charges were first aired before the Federal Maritime Commission, which dismissed plaintiffs' complaint alleging violations of sections 15, 16 First, and 18 of the Shipping Act[3] on the ground that this trade between foreign ports, of goods owned and shipped by foreigners to foreigners,[4]

---

1. Liability is alleged as to most of the defendants by virtue of their participation in either the Atlantic and Gulf American - flag Berth Operators (AGAFBO) or the West Coast American-flag Berth Operators (WCAFBO) conferences, rather than from active participation in the Far East interport trade.

2. Agency for International Development.

3. 46 U.S.C. §§ 814, 815 First, 817, respectively.

4. The Federal Maritime Commission found that "the cargoes carried by PSI are entirely commercial in nature originating in one foreign port and destined to an-

was not within the Commission's jurisdiction under the Shipping Act. That ruling was not appealed. Plaintiffs' subsequently-filed complaint for damages under the antitrust laws [5] was dismissed, at the close of oral argument, when the District Court granted defendant's motion for dismissal of the complaint. This order was presumably based on the jurisdictional ground that the Sherman Act was inapplicable to the complaint because of the absence of a claim of restraint of foreign commerce.[6] We reverse that determination.

These are the pertinent facts as set forth in the complaint, which must be accepted as true for purposes of a motion to dismiss. Plaintiffs Pacific Seafarers, Inc. (PSI) and Seafarers, Inc. (Seafarers)[7] are American corporations, formerly engaged in the ocean shipping business. They operated United States flag vessels, manned by American crews. Plaintiffs' business operations were centered in New York, and their ships intermittently returned to the United States for personnel and maintenance requirements. Plaintiffs' business was selling their American-flag shipping services to cement and fertilizer exporters in Taiwan, and, to a lesser extent, Thailand, who needed American-flag shipping for AID-financed sales to importers in South Vietnam. AID does not own the goods, nor does it arrange for their transportation. It does, however, provide, either on loan or grant basis, dollars to the South Vietnamese Government, which in turn sells these dollars to South Vietnam merchants desiring to finance their purchases abroad. AID implements the Cargo Preference Law [8] by regulations requiring that at least 50% of AID-financed cargoes be transported to the recipient country in privately owned United States-flag commercial vessels. Furthermore, as a matter of policy, AID finances the costs of transportation, in addition to cargo, where the shipping is done in American-flag vessels.[9] These regulations effectively reserve the trade in carriage of AID-financed cargo for American shipping.

At the time plaintiffs entered the business it was handled primarily by American-flag competition engaged in round-trip voyages from the United States to the Far East. In the course of their journeys, these vessels would stop to take on cargoes of foreign origin destined for ports farther along. The rate for this service was set by AFBO,[10] an association of American-flag carriers which are members of either or both AGAFBO [11] or WCAFBO,[12] both conferences of American-flag shippers organized to carry military cargoes for the Government (which must likewise use American-flag shipping where available). Neither the AFBO agreement, nor the rates set thereunder for cargoes originating in foreign ports and destined to foreign ports, were filed with the Federal Maritime Commission.

other foreign port. The shipping arrangements as well as the sales of the commodities are made between foreign principals. Although the U.S. Government through the Agency for International Development (AID) ultimately finances the sales—including the cost of water transportation—our Government in no way participates in the transactions." (JA 114)

5. 15 U.S.C. § 15.

6. The District Judge rendered his decision from the bench at the close of oral argument. He stated: "I am of the opinion that the complaint does not state facts constituting a cause of action under the Sherman Antitrust Act and, therefore,

this Court is without jurisdiction and the motions to dismiss will be granted." (JA 167)

7. The other plaintiffs' claims are derivative.

8. 46 U.S.C. § 1241(b). See AID Regulation 1, § 201.6(N).

9. Affidavit of David E. Bell, former Administrator of AID. (JA 147)

10. American-flag Berth Operators.

11. Atlantic-Gulf American-Flag Berth Operators.

12. West Coast American-flag Berth Operators.

Plaintiffs thought that by using older, less-expensive vessels they could institute and profitably operate a substantial service in AID-financed cargoes. As stated by plaintiffs, defendant American-flag shipping lines acted to preserve this profitable trade to themselves, at rates set pursuant to concerted action and not subject to regulatory scrutiny. They first sought to erect legal barriers to plaintiffs' getting the business, and when they failed in that endeavor they dropped their prices and drove plaintiffs out of business.

(a) Their first effort was to seek issuance of a directive from AID limiting AID-financed shipping in the area to "conference liners." That would have excluded plaintiffs' vessels, but it was not obtained.

(b) Defendants then successfully urged the Director General of Commerce of South Vietnam to issue a ruling to South Vietnamese importers requiring that all future AID-financed shipments of cement be shipped on liners operated by AFBO members. Plaintiffs were not then members of AFBO, but AID countermanded that directive.

(c) Next, plaintiff PSI was told by the Director General that it would have to join WCAFBO if it wished to continue in the South Vietnamese cement business. When PSI tried to comply, its application for membership was blocked because it had no Military Sea Transportation Service Contract (MSTS) with the Defense Department, as did all other WCAFBO members. Plaintiff sought such a general eligibility contract, and seven of the appellees tried to block it by protesting to the Defense Department. That too was unsuccessful.

(d) Finally, at an AFBO meeting held in the United States, the rates on cement

and fertilizer from Taiwan to South Vietnam, and on cement from Thailand to South Vietnam were thrown open, and they dropped from $8.95 per long ton to $4.96 per long ton. All other rates were maintained.

Plaintiffs were shortly driven out of business. Thereafter defendants raised the rates, and indeed raised them to substantially higher levels than those prevailing before plaintiffs sought to enter the trade.

1. We first consider defendants' arguments that principles of collateral estoppel and "practical primary jurisdiction considerations" preclude relitigation by plaintiffs of the Federal Maritime Commission's determination that this trade, carried on "totally within the confines of Far Eastern ports," was not part of "our foreign commerce."

██ Principles of collateral estoppel may properly be applied in administrative cases.[13] In general these principles apply to jurisdictional issues [14] and we may assume that they require giving effect in subsequent litigation to an agency's determination of facts underlying its conclusion that jurisdiction was lacking. In this case, however, there is no real dispute concerning those facts which the Commission held to be jurisdictional. Thus, plaintiffs do not seriously allege that they were plying a trade other than selling shipping services to foreigners, for transportation of foreign-owned goods to foreign consignees. They do not allege that the goods thus transported between foreign ports originated in the United States. On the other hand, defendants cannot seriously contest that the key to this whole trade was that plaintiffs and defendants were not just selling shipping services: They were selling United

---

13. United States v. Utah Constr. & Min. Co., 384 U.S. 394, 422, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 402–403, 60 S.Ct. 907, 84 L.Ed. 1263 (1940); Fairmont Aluminum Co. v. Commissioner of Internal Revenue, 222 F.2d 622, 627 (4th Cir.), cert. denied, 350

U.S. 838, 76 S.Ct. 76, 100 L.Ed. 748 (1955); 2 Davis, Administrative Law §§ 18.01–18.10 (1958).

14. Sunshine Anthracite Coal Co. v. Adkins, *supra*, 310 U.S. at 403, 60 S.Ct. 907; Estevez v. Nabers, 219 F.2d 321, 323–324 (5th Cir. 1955).

States-flag shipping services, which fact was of crucial importance to importers requiring AID-dollar financing for their transactions. Thus the sole question is whether, under those facts, a conspiracy to drive plaintiffs out of the business of selling United States-flag shipping services is a restraint on United States foreign commerce subject to the Sherman Act.

Although the Commission was of the view that defendant's activities had no effect on United States "foreign commerce," that determination rested solely on the standards of the Shipping Act of 1916. Thus the Commission held that its entire jurisdiction was limited to activities affecting "foreign commerce" within the intendment of section 1 of the Shipping Act,[15] which defines a "common carrier by water in foreign commerce" as a "common carrier * * *

engaged in the transportation by water of passengers or property between the United States or any of its Districts, Territories, or possessions and a foreign country." As plaintiffs carried no property or passengers to or from the United States they were not engaged in foreign commerce under the Shipping Act.[16]

■ The Commission did not rule that there was no "foreign commerce" as that term is used in the Sherman Act, nor did it rule that the standards under the two acts were the same. It is commonplace in the law to encounter instances of the same words being given different scope in different contexts.[17] Indeed counsel for the defendants effectively put it to the Commission that jurisdiction under the Shipping Act is narrower than under the Sherman Act, and counsel objected to antitrust principles being "dragged in by the heels."[18]

---

15. 46 U.S.C. § 801.

16. Section 15 of the Shipping Act provides that, "Every common carrier by water, or other person subject to this chapter, shall file immediately with the Commission a true copy, or, if oral, a true and complete memorandum, of every agreement with another such carrier or other person subject to this chapter, or modification or cancellation thereof, to which it may be a party or conform in whole or in part, fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement. The term 'agreement' in this section includes understandings, conferences, and other arrangements." 46 U.S.C. § 814. The Commission thus substantially limited the broad term "every agreement," presumably on the ground that the sole concern of the Shipping Act was with that trade which by virtue of § 1 made anyone carrying it subject to the Act. A similar approach, albeit in a different

context, was rejected by the Supreme Court in Volkswagenwerk Aktiengesellschaft v. FMC, 390 U.S. 261, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968).

Moreover, the Commission held that, in the AFBO context, the defendants "cannot be deemed to be engaged in the foreign commerce of the United States, * * * for the simple reason that the trade does not involve as one terminus any port in a State, District, Territory or possession of the United States."

17. Smiley v. Holm, 285 U.S. 355, 52 S.Ct. 397, 76 L.Ed. 795 (1932); Atlantic Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 434, 52 S.Ct. 607, 76 L.Ed. 1204 (1932); Sampson v. Channell, 110 F.2d 754, 128 A.L.R. 394, 1st Cir.), cert. denied, 310 U.S. 650, 60 S.Ct. 1099, 84 L.Ed. 1415 (1940); Cf. Towne v. Eisner, 245 U.S. 418, 38 S.Ct. 158, 62 L.Ed. 372 (1918); Cook, "Substance" and "Procedure" in the Conflict of Laws, 42 Yale L.J. 333, 337 (1933).

18. The following colloquy took place at oral argument before the Commission:

Commissioner Hearn: Now, do you contend that, furthering Mr. Patterson's question, do carrier members of AFBO, purely by reason of the foreign inter-port carriage, can act with impunity so far as this Commission is concerned, dealing with MSTS and AID cargo, even to the detriment of the United States-flag carrier?

Mr. Poole: So far as the Shipping Act is concerned, yes. I think they

Accordingly defendants cannot bootstrap the Commission's determination into a preclusive ruling on whether foreign commerce was restrained under Sherman Act standards.[19]

2. We turn therefore to the principal issue in the case: Whether the District Court was correct in its jurisdictional determination that the complaint made no allegation of restraint on United States foreign commerce. Seeking affirmance of that ruling, defendants urge that there can be no restraint of United States foreign commerce, and hence no Sherman Act violation, no matter how egregious the conduct under Sherman Act standards, unless there is restraint of, or substantial effect on, United States commodity imports or exports or transportation to or from the United States.

■ In our view plaintiffs, in participating in the market of supplying the service of transportation in United States-flag vessels, were engaged in for-eign commerce of the United States. We have no doubt that the Sherman Act applies to the restraint alleged here, an attempt by American firms to deny another American firm access to a line of international shipping trade created by Congress for the general benefit of American shipping. We hereafter elaborate our reasons for these views.

■ 3. We may usefully begin our analysis by considering defendants' rather guarded assertions that the carriage of foreign-owned goods between foreign ports in American vessels may not be "commerce with foreign nations" subject to constitutional regulation by Congress. Concededly defendants themselves are engaged in United States foreign commerce, because they carry United States exports and imports. Their actions clearly can be regulated by Congress. Their contention, however, is that the Sherman Act cannot be applicable unless United States foreign commerce itself is restrained.[20] Obviously if plaintiffs

take their chances under the antitrust laws.

Commissioner Hearn: Well, in that case, you draw the distinction between foreign commerce of the United States and section 15 here?

Mr. Poole: Yes.

Well, section 15 I think can only be read in reference to section 1 of the Act where it defines those carriers which are subject to the regulation of the Shipping Act. There section 1 makes it pretty clear that it is only those carriers which are in the foreign trade from or to ports in the United States or districts, territories, and possessions of the United States are those carriers in the foreign commerce which are regulated by the Shipping Act.

What I am saying is it has been held, and I think it is true, that the jurisdiction under the Shipping Act is more restrictive than the jurisdiction under the antitrust laws. That is why I objected to antitrust principles being dragged in by the heels, so to speak, to define the jurisdiction of the Commission under the Shipping Act. (JA 148)

19. In our view the judgment cannot be affirmed because of the doctrine of primary jurisdiction invoked by appellees.

The Hearing Examiners' findings insofar as they are purely factual are not really contested. Insofar as they make judgment on matters like legal causality under antitrust standards, their significance is limited both because the Commission made no ruling on them, and in any event, they do not lie within the area of expertise which justifies deference to the agency's findings.

Furthermore, the purpose of the primary jurisdiction doctrine is to harmonize the application of antitrust and regulatory policies. The Commission held merely that it had no regulatory power with respect to this conspiracy, not that this was lawful behavior under the Act and consistent with public interest. Compare S.S.W., Inc. v. Air Transport Ass'n of America, 89 U.S.App.D.C. 273, 280, 191 F.2d 658, 664 (1951), cert. denied, 343 U.S. 955, 72 S.Ct. 1049, 96 L.Ed. 1355 (1952).

20. Defendants' point rests on analogy from cases involving restraints in interstate commerce, holding the Sherman Act is applicable only where the target of the restraint is interstate commerce, e.g., Lieberthal v. North Country Lanes, 332 F.2d 269, 272 (2d Cir. 1964); Page v. Work, 290 F.2d 323, 330 (9th Cir.), cert. denied, 368 U.S. 875, 82 S.Ct. 121,

were not engaged in United States foreign commerce in the constitutional sense, there could be no such restraint. We therefore consider whether plaintiffs engaged in United States foreign commerce.

■■ Gibbons v. Ogden [21] makes clear that, as used in the Constitution, "commerce" is a very broad concept which includes navigation—not merely because of the relationship between shipping and the movement of goods,[22] most

certainly commerce, but also because shipping itself is a form of gainful economic activity.[23] Were it not so, Chief Justice Marshall wrote, "the government of the Union has no direct power over the subject, and can make no law prescribing what shall constitute American vessels, or requiring that they shall be navigated by American seamen." [24]

Gibbons v. Ogden unequivocally states that the constitutional language granting Congress power to regulate "commerce

7 L.Ed.2d 76 (1961); David Cabrera, Inc. v. Union de Choferes y Dueños, 256 F.Supp. 839, 843–844 (D.P.R.1966).

Similarly the defendants urge that United States v. Yellow Cab Co., 332 U.S. 218, 230–232, 233, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947) holds that the "commerce affected by a restraint on transportation is determined by terminal points of the journey. In that case, the Supreme Court dismissed, for want of a restraint of interstate commerce, that portion of the Government's antitrust complaint that related to a monopoly of local taxicab service. However, the problem there is primarily whether the federal government, acting within the framework of a federal system has power to deal with such local restraint. The issue turns, as it must under the Constitution, on whether the facts show an effect on interstate commerce. The disclaimer of interstate commerce does not constitute a withdrawal of American law, but an assessment that what is involved is a matter of local law rather than national law.

Where foreign commerce is involved, however, the issues are different. In a sense the question of interpretation may still be similar: Whether United States regulation is reasonable in light of the international, rather than intrastate, character of the trade. However, the problem is different for the courts because the question may properly be answered by reference to factors such as citizenship that are meaningful in an international setting yet not involved where the issue is whether local commerce or national interstate commerce is restrained. Furthermore, the courts have an obligation to follow Congressional will that is greater when the only reason for failure to do so is lack of harmony with principles of international law, than it is when the Congressional intention is counter to the Constitutional mandates

reserving the regulation of local affairs to the states rather than to Congress. *Compare* Atlantic Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 434, 52 S.Ct. 607, 76 L.Ed. 1204 (1932).

21. 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824).

22. *Compare* United States v. South Eastern Underwriters Ass'n, 322 U.S. 533, 538 n. 7, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944) where the Government, appealing a dismissal of an indictment, argued that even if insurance was not "commerce" a restraint in the insurance industry was a restraint on those industries which must buy fire insurance. Because of its broad reading of "commerce" the Court found it unnecessary to pass on such questions.

23. See also Justice Story's construction of the word "trade" in the Coasting and Fishery Act of 1793, 1 Stat. 305, in The Nymph, 18 Fed.Cas.No. 10388, page 506 (1834), quoted by the Supreme Court in United States v. National Ass'n of Real Estate Boards, 339 U.S. 485, 490–491, 70 S.Ct. 711, 715, 94 L.Ed. 1007 (1950): "The argument for the claimant insists that 'trade' is here used in its most restrictive sense, and as equivalent to traffic in goods, or buying and selling in commerce or exchange. But I am clearly of opinion that such is not the true sense of the word, as used in the 32d section. In the first place, the word 'trade' is often, and indeed generally, used in a broader sense, as equivalent to occupation, employment, or business, whether manual or mercantile. Wherever any occupation, employment, or business is carried on for the purpose of profit, or gain, or a livelihood, not in the liberal arts or in the learned professions, it is constantly called a trade."

24. 22 U.S. (9 Wheat.) at 190, 6 L.Ed. 23.

with foreign nations" authorizes Congressional enactment of laws regulating "every species of commercial intercourse between the United States and foreign nations." [24A] That much was "universally admitted" in 1824. Plainly, United States vessels engage in a "species of commercial intercourse" between the United States and foreign nations regardless of the ownership or national origin of the goods they carry.

One of the significant accounts in foreign commercial intercourse is the fact that certain maritime nations earn income for their balance of international payments by providing transportation services involving neither their ports nor their products. Examples readily suggest themselves: e. g., Norway, Greece, Great Britain. They are engaged, in terms that are readily and fully understood by practical businessmen as well as theoretical economists, in the "export" of shipping services. So too, when American vessels earn transportation income, whether by payments from foreigners or Americans, there is direct benefit to the economy of the United States. More American seamen are employed and there is more business for American-based service industries dependent on shipping—e. g., repair and insurance. The fact that American-flag vessels must carry American crews,[25] and are liable to penalty tax if they are repaired abroad,[26] and are available to the Government in time of national emergency [27] provides a substantial and on-going nexus to the United States.

These are the kinds of beneficial consequences, apart from any interest of the vessel owner himself, that nations further in their public interest by protecting the trade aspirations of their citizens. That policy is particularly compelling where ships are concerned because of the need to maintain a strong merchant marine available in wartime regardless of its peacetime routes.

■ Substantiating our view that the sale of American flag shipping services to foreigners is itself a form of United States foreign trade, is the protection Congress accorded to that trade in section 14 of the Shipping Act of 1916. That section authorizes the Federal Maritime Commission to bar foreign carriers from United States ports if they are parties to an agreement respecting transportation between foreign ports that excludes American-flag carriers from admission on equal terms.[28] And defendants apparently concede that the National Labor Relations Act, 29 U.S.C. § 151 et seq., passed by Congress under its commerce power, is applicable to all American-flag vessels.[29]

**24A.** 22 U.S. (9 Wheat.) at 193, 6 L.Ed. 23.

**25.** 46 U.S.C. § 672a(b), requires generally that 75% of the crew shall be United States citizens.

**26.** 19 U.S.C. § 257.

**27.** 46 U.S.C. § 1242(a). The statute applies to all vessels owned by citizens of the United States.

**28.** 46 U.S.C. § 813, providing in pertinent part:

"The Federal Maritime Board upon its own initiative may, or upon complaint shall, after due notice to all parties in interest and hearing, determine whether any person, not a citizen of the United States and engaged in transportation by water of passengers or property—

\* \* \* \* \*

"(2) Is a party to any combination, agreement, or understanding, express or implied, that involves in respect to transportation of passengers or property between foreign ports, deferred rebates or any other unfair practice designated in section 812 of this title, and that excludes from admission upon equal terms with all other parties thereto, a common carrier by water which is a citizen of the United States and which has applied for such admission."

Any person who is a party to such an agreement is denied the right of entry to United States ports.

**29.** Defendants note that the Jones Act, 46 U.S.C. § 688, according a remedy to seamen injured in the course of their employment, is rooted in Congress's Article III admiralty power. As to the

4. We hold that plaintiffs were engaged in the foreign commerce of the United States for purposes not only of determining constitutional power, but also of determining the applicability of the Sherman Act, which prohibits conspiracies "in restraint of trade or commerce among the several States, or with foreign nations."

 The basic approach to Sherman Act construction is the broad premise that Congress exercised therein the full scope of its powers under the Commerce clause of the Constitution.[30] That premise has been stated in cases involving interstate commerce, and may well be subject to limitations—for cause shown, so to speak—in regard to foreign commerce.[31] For example, it may fairly be inferred, in the absence of clear showing to the contrary, that Congress did not intend an application that would violate principles of international law.[32]

National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, defendants contend that this is mere application of the internationally recognized principle that for purposes of on-board conduct and regulation of the crew, ships are part of the territory of the flag nation. United States v. Flores, 289 U.S. 137, 53 S.Ct. 580, 77 L.Ed. 1086 (1933). While it may be that the fiction justifies application of United States law to American vessels as a matter of international law, it by no means follows that this serves as the source of Congressional power under our constitutional law. The constitutional basis of the National Labor Relations Act is, pure and simple, the commerce power.

30. *See,* United States v. Frankfort Distilleries, 324 U.S. 293, 298, 65 S.Ct. 661, 89 L.Ed. 951 (1945); United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 558, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944); Atlantic Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 435, 52 S.Ct. 607, 76 L.Ed. 1204 (1932).

31. In United States v. Aluminum Co., 148 F.2d 416, 443 (2d Cir. 1945), Judge Learned Hand wrote: "Nevertheless, it is quite true that we are not to read general words, such as those in this Act, without regard to the limitations customarily observed by nations upon the exercise of their powers; limitations which generally correspond to those fixed by the 'Conflict of Laws.' We should not impute to Congress an intent to punish all whom its courts can catch, for conduct which has no consequences within the United States."
The International complications that have arisen concerning the application of United States antitrust laws to foreign commerce relate primarily to subjection of foreigners to United States laws for acts not done in the United States. *See, e.g.,* British Nylon Spinners, Ltd. v. Imperial Chemical Industries, Ltd., 2 All E.R. 780 (Ct.App. 1952). The theory on which this liability has proceeded is that "any state may impose liabilities, even upon persons not within its allegiance, for conduct outside its borders that has consequences within its borders which the state reprehends; and these liabilities other states will ordinarily recognize." United States v. Aluminum Co. of America, *supra,* 148 F.2d at 443. Conformance to international law is argued by analogy to the decision in The Case of the S.S. "Lotus" P.C.I.J. Ser.A. No. 10 (1927).
In the case at bar, however, no such international complications are present insofar as nationality is a recognized international basis for prescribing conduct, *cf.* Blackmer v. United States, 284 U.S. 421, 52 S.Ct. 252, 76 L.Ed. 375 (1932), and in any event the interests of foreign parties are insubstantial. Thus while we agree with defendants' arguments that considerations of comity are appropriate in construction of the antitrust laws, we think that here it is the Sherman Act's applicability, rather than inapplicability, that is supported by consideration of the "comity" factors—considerations similar to the factors appropriate in choice-of-law cases, see generally Cheatham & Reese, Choice of the Applicable Law, 52 Colum.L.Rev. 959 (1952).

32. *Compare* McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 21, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963) *with* The Charming Betsy, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804) (Marshall, C.J.).
For a sampling of the dialogue concerning the legality under international standards of applications of the antitrust laws of the United States to foreign nationals *see, e.g.,* Carlston, Antitrust Policy Abroad, 49 Nw.U.L.Rev. 713 (1955); Fugate, Antitrust Jurisdiction and Foreign Sovereignty, 49 U.Va.L.Rev.

However, the broad statement that Congress has exercised the full sweep of its commerce powers is not without significance in determining whether the Sherman Act applies as to restraints that operate, in the constitutional sense, against the "foreign commerce" of the United States. The Sherman Act has aptly been characterized as a "charter of freedom." [33] Its principle of limiting the accumulation and exercise of dominant economic power [34] is rooted in historic notions of the invalidity of unreasonable trade restraints,[35] and that policy has been increasingly accepted as a fundamental principle of our system.[36] If, as defendants contend, that policy cannot extend to the full sweep of American foreign commerce because of the international complications involved, then surely the test which determines whether United States law is applicable must focus on the nexus between the parties and their practices and the United States, not on the mechanical circumstances of effect on commodity exports or imports.

The Sherman Act is not limited, in effect, to restraints on sales of goods. That is the thrust of defendants' distinction. In the domestic setting, however, it is settled that the Sherman Act's bar on unreasonable restraints on trade or commerce extends to service industries—and transportation is clearly a service industry [37]—as part of commerce.[38] There is no basis in the statute or in reason to argue that conspiracies in service industries are proscribed only if the services are in interstate commerce, and not if they are in foreign commerce.[39]

Defendants correctly point out that the cases hitherto applying the Sherman Act to foreign commerce have in fact involved either exports or imports of goods, or transportation to or from

925 (1963); Whitney, Sources of Conflict Between International Law and the Antitrust Laws, 63 Yale L.J. 655 (1954); Symposium, Extraterritorial Effect of the U.S. Antitrust Laws, A.B.A. Antitrust Law Section, Proceedings at the Annual Meeting 65 (1957); Hearings before the Subcommittee on Antitrust and Monopoly of the Senate Committee on the Judiciary, 89th Cong., 2d Sess. (1966).

33. Appalachian Coals, Inc. v. United States, 288 U.S. 344, 359, 53 S.Ct. 471, 77 L.Ed. 825 (1933).

34. See generally Bork, Bowman, Blake & Jones, The Goals of Antitrust: A Dialogue on Policy, 65 Colum.L.Rev. 422 (1965).

35. Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); United States v. Addyston Pipe & Steel Co., 85 F. 271 (6th Cir. 1898), aff'd 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899); Dewey, Common-Law Background of Antitrust Policy, 41 U.Va.L. Rev. 759 (1955).

36. Antitrust principles are relevant even in those economic sectors subject to day-to-day supervision by federal regulatory agencies. FMC v. Aktiebologat Svenska Amerika Linien, 390 U.S. 238, 88 S.Ct. 1005, 19 L.Ed.2d 1071 (1968); United States v. El Paso Natural Gas Co., 376

U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964); United States v. Radio Corp. of America, 358 U.S. 334, 351, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959); Georgia v. Pennsylvania R. Co., 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945); City of Pittsburgh v. FPC, 99 U.S.App.D.C. 113, 237 F.2d 741 (1956).

37. United States v. Joint Traffic Ass'n, 171 U.S. 505, 19 S.Ct. 25, 43 L.Ed. 259 (1898); United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897).

38. United States v. National Ass'n of Real Estate Boards, 339 U.S. 485, 70 S.Ct. 711, 94 L.Ed. 1007 (1950); Atlantic Cleaners & Dyers, Inc. v. United States, supra note 17; United States v. American Medical Ass'n, 72 U.S.App.D.C. 12, 110 F.2d 703, cert. denied, 310 U.S. 644, 60 S.Ct. 1096, 84 L.Ed. 1411 (1940).

39. With this case in a purely jurisdictional posture we need not consider the question, in many ways more difficult, whether in terms of ruling on the merits of the validity of actions taken, the Sherman Act standards of reasonableness developed for interstate commerce should be applicable with full force to foreign transactions, and whether that issue is still open in light of Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).

United States ports,[40] and conclude that it is inapplicable unless one or the other is present.[41] We recognize that ours is the first ruling on the issue before us—but if there has never before been a ruling affirming application of the Act to this kind of trade, neither has there been a ruling rejecting that application. The matter is *res nova*, and we must decide it in the light of the reasoning and analysis that appears to us to be sound.

It may be noted that in related contexts contentions close to those urged by defendants have not been accepted. A mechanical commodity export-import limitation was rejected by the District Court in In re Grand Jury Investigation of the Shipping Industry, 186 F.Supp. 298, 313 (D.D.C.1960). Prior to that it had been rejected as unsound by the 1955 Report of the Attorney General's National Committee to Study the Antitrust Laws (pp. 77–80). We reject it also.

It may be assumed that, as a matter of construing Congressional intent, the Sherman Act has no application where the market involved consists of shipping services between two foreign ports, without any American characteristic, and the only American aspect is that one or some of the persons competing in the transportation market is offering American flag ships. In the case before us, however, we hold that, since there is an identifiable, distinctive market for American-flag shipping service where the American characteristic is dominant—a market defined as involving the transportation of AID-financed cargoes, which has a definite nexus with significant interests of the United States—the Sherman Act is applicable to a conspiracy to exclude newcomers from the trade.[42]

Our conclusion as to the existence of the requisite nexus is influenced by three salient considerations. First, the trade is entirely a product of the United States policy of subsidizing its merchant marine. It is the United States that has the greatest interest in this trade, and its conduct on a strong and efficient basis. Defendants claim that AID is merely a financier, yet the fact that the foreign importers were willing to accept the burden of higher-cost United States-flag shipping in order to get AID financing tends to show that AID was providing a stimulus to trade far beyond the realm of the conventional private financier. We may take note of what Judge Ryan found, on a more complete record, concerning the significance of AID and its programs. In United States v. Concentrated Phosphate Export Ass'n he wrote:

> We also do not accept or agree with defendant's argument that AID was but an incidental party to the transaction—no more than the usual financing institution found in international transactions where there are problems of currency exchange. AID was at the center of the transactions, it was the force which initiated, directed, con-

---

40. *See, e.g.*, Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 704, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962) (United States vanadium exports); Timken Roller Bearing Co. v. United States, *supra* note 39 (imports and exports of industrial bearings); United States v. Sisal Sales Corp., 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042 (1927) (United States sisal imports); United States v. Aluminum Company of America (ALCOA), 148 F.2d 416 (2d Cir. 1945) exports and imports of aluminum ingot); United States v. Imperial Chemical Industries, 100 F.Supp. 504, 591–592 (S.D.N.Y.1951) (exports and imports of explosive powder); United States v. General Electric Co., 82 F.

Supp. 753, 891 (D.N.J.1949) (exports and imports of incandescent lamps).

41. Where the allegedly illegal restraint concerns commodities then, of course, the absence of an effect on United States exports or imports renders the Sherman Act inapplicable. *See, e.g.*, Alfred Bell & Co. v. Catalda Fine Arts, Inc., 191 F. 2d 99, 105 (2d Cir. 1951) (price-fixing agreement "explicitly confined to Great Britain and Ireland" not violative of United States antitrust laws).

42. *Compare,* Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); Branch v. FTC, 141 F.2d 31 (7th Cir. 1944), both of which condemned, as ille-

trolled and financed them. Without AID, there would have been no sale or purchase and the extent of the role it played was known in every detail to and relied on by both parties to the transactions, particularly by the supplier who looked to it for payment and obligated itself to conform to its requirements and conditions if he was to receive payment.[43]

Since the United States has established and promoted, in carriage of AID-financed movements, this trade of providing American-flag shipping service, it is only reasonable to expect the "fundamental national economic policy" of the antitrust laws to be applicable.[44] Clearly, the right of all American-flag ships to participate is basic. Had there been a conspiracy of *foreign* carriers to exclude American-flag ships from access to trade, the Federal Maritime Commission would have been directed to exclude them from United States ports.[45] Can it be supposed that Congress intended American competitors to be able to organize a similar conspiracy with total immunity for their conduct?

Secondly, all parties must be Americans to participate in serving this market for American-flag shipping. Consequently there are few possible international complications to justify an interpretation that deliberately cuts back on the scope of the antitrust laws as applied to commerce which greatly concerns the United States. It is plain that where American foreign commerce is affected foreigners may be held under our antitrust laws for restraints thereon.[46] It is also significant, for the purpose of determining whether what is involved constitutes activities affecting American foreign commerce within the scope of the antitrust laws that the trade not only has significant contacts and nexus with the United States but also is the province of American concerns.[47]

5. We now consider whether the foregoing analysis is to any extent aborted or negatived by defendants' contention that, whatever the case as to the application of the antitrust laws generally to foreign commerce not involving commodity exports, the Sherman Act must be read in conjunction with, and be limited by, the Shipping Act of 1916. Defendants thus switch from their prior posi-

gal, conduct by American firms having an adverse effect on the international business opportunities of other American firms. See also the Webb-Pomerene Act, 15 U.S.C. §§ 61–65, conditioning antitrust immunity for export associations, in part, on the absence of restraint on the export trade of any domestic corporation.

43. 273 F.Supp. 263, 270–271 (S.D.N.Y. 1967) prob. juris noted, 390 U.S. 1001, 88 S.Ct. 1245, 20 L.Ed.2d 102 (1968).

44. Carnation Co. v. Pacific Westbound Conf., 383 U.S. 213, 218, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966).

45. *See* 46 U.S.C. § 813, quoted note 28, *supra.*

46. It is settled that the antitrust laws may apply to foreigners. *See, e.g.,* United States v. Watchmakers of Switzerland Information Center, Inc., 133 F.Supp. 40; 134 F.Supp. 710 (S.D.N.Y.1955); 168 F.Supp. 904 (S.D.N.Y.1958).

Where restraints of commodity exports or imports are concerned, the test most used to determine whether the Sherman Act is applicable to acts done outside the

United States is that formulated by Judge Learned Hand in United States v. Aluminum Co. of America, *supra* note 31, whether the agreement was intended to, and did affect United States imports or exports. *See, e.g.,* United States v. Minnesota Mining & Mfg. Co., 92 F.Supp. 947 (D.Mass.1950). The principal question is what is meant, in this context, by the word "intent" in light of the presumption that persons are presumed to intend the natural consequences of their actions.

The considerations outlined in this opinion of American contacts and nexus (see *supra,* p. 816) provide objective criteria that may usefully supplement such an "intent" test.

47. In our case it is effectively the province of American operators, by law. It is significant that in the overwhelming bulk of the decided cases involving application of the antitrust laws to American commerce, the prohibited conspiracy was one in which American concerns played a significant role. *See, e.g.,* cases cited note 40, *supra.*

tion before the Commission,[48] and now urge that the Commission's jurisdiction and the Sherman Act are coterminous. If the two acts are to be held to have similar coverage, it may well be because insofar as agreements of common carriers affecting foreign commerce are concerned, the Commission was in error in its narrow view of Shipping Act jurisdiction,[49] not because the Sherman Act is to be narrowed.

The Supreme Court has specifically held that the antitrust laws, which "represent a fundamental national economic policy," continue in effect as to the shipping industry, and their rate-making activities in foreign commerce. Carnation Co. v. Pacific Westbound Conference, 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966). The Court recognized that the Shipping Act limits the scope of the antitrust laws, but this curtailment was confined to the *"explicit* provision exempting activities which are lawful under § 15 of the [Shipping] Act," and the Court declined to countenance any *"unstated* legislative purpose to free the shipping industry from the antitrust laws." See 383 U.S. at 216, 217, 86 S.Ct. at 783. (Emphasis added) Therefore the antitrust laws continue in effect, without modification based merely on implication, as to common carriers, subject to the Act, which do not obtain the Commission approval under § 15 which Congress required as a condition of exemption. The antitrust laws also continue in effect as to areas not subject to the Shipping Act—e. g., a restraint engineered by one or more ocean tramps affecting American foreign commerce. The fact that the Shipping Act is limited by virtue of § 1, to those vessel operators who are "common carriers" certainly cannot be supposed to make an exemption available, say, to operators not common carriers, offering service of transporting commodities from the United States. That instance is not our case, of course, but it exemplifies that the two acts do not precisely mesh.[50]

In a more sophisticated contention, defendants say that the fact that the provision in § 15 providing an exemption from the antitrust laws was not made applicable to shipping between foreign ports is an indication of Congressional understanding that such shipping was not subject to the American antitrust laws. Indeed Congress contemplated in § 14 of the Act that American carriers would participate in foreign rate conferences governing shipping between foreign ports, and could hardly have supposed that they would be subject to the antitrust laws, or to more competition than governed shipping to and from the United States.

The dispositive analysis seems to us to run as follows: We are not to turn to the acts of subsequent Congresses for unstated exemptions, or implied repeals, of the antitrust laws. That is clear from *Carnation.*[51] Moreover, "how members of the 1914 Congress may have interpreted the 1890 Act is not of weight for the purpose of construing the Sherman Act."[52]

The immunity granted by Congress in the Shipping Act was limited to those instances where there was some assurance, provided by Commission approval, that acts immunized from the antitrust laws were not contrary to the over-all public interest. We have al-

---

48. See note 18, *supra.*

49. See note 16, *supra.*

50. The Shipping Act does not eliminate all possibility of risks under the antitrust laws. *Compare* Ryan, J., in Sabre Shipping Corp. v. American Presidential Lines, 285 F.Supp. 949, 953 (S.D.N.Y., 1968).

51. *See also,* United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 350, 83 S.Ct.

1715, 10 L.Ed.2d 915 (1963); Pan American World Airways v. United States, 371 U.S. 296, 83 S.Ct. 476, 9 L. Ed.2d 325 (1963); People of State of California v. FPC, 369 U.S. 482, 82 S. Ct. 901, 8 L.Ed.2d 54 (1962); United States v. Borden Co., 308 U.S. 188, 201, 60 S.Ct. 182, 84 L.Ed. 181 (1939).

52. United States v. Wise, 370 U.S. 405, 414, 82 S.Ct. 1354, 7 L.Ed.2d 342 (1962).

ready expressed our doubt whether the Commission correctly disclaimed jurisdiction over the commerce before us. But assuming, for discussion, that the Commission was right, this is at most a *casus omissus*, and the antitrust exemption or limitation is not to be implied, but is to be furnished only when and as directed by the legislature, which has hitherto accompanied such directions with substitute provisions to safeguard the public interest.

Finally, we turn to defendants' argument that American participation in unapproved foreign conferences is contemplated by § 14 of the Shipping Act, and hence cannot reasonably be deemed governed by the antitrust laws. Such foreign conferences do not have the primary nexus of American contacts (*supra* point 5), which underlies our ruling that the activities before us constitute foreign commerce within the meaning of the Sherman Act.

Reversed and remanded.

Tamm, Circuit Judge, dissented in part.